# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| In the Matter of: | } | |
| | } | |
| MORGAN T. JONES | } | CASE NO. 06-81987-JAC-13 |
| SSN:   XXX-XX-7451 | } | |
| | } | CHAPTER  13 |
| Debtor(s). | } | |
| | } | |
| | | |
| MORGAN T. JONES | } | AP NO. 06-80150-JAC-13 |
| | } | |
| Plaintiff(s), | } | |
| v. | } | |
| | } | |
| GENERAL MOTORS ACCEPTANCE | } | |
| CORPORATION, a corporation and, | } | |
| BILL SMITH PONTIAC BUICK GMC, | } | |
| INC., a corporation | } | |
| Defendant(s). | } | |

## MEMORANDUM OPINION

Currently pending before the Court are the motions of defendants Bill Smith Pontiac Buick,

GMC, Inc. ("Bill Smith") and General Motors Acceptance Corporation ("GMAC") for summary

judgment and the motion of plaintiff Morgan T. Jones ("Jones") for partial summary judgment.

Summary judgment is proper under Fed.R.Civ.P. 56(c), made applicable to adversary proceedings

in bankruptcy cases by Bankr. R. 7056, "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."[1]  "'In making

this determination, the court must view all evidence and make all reasonable inferences in favor of

---

[1]        *Gray v. Manklow (In re Optical Technologies, Inc.)*, 246 F.3d 1332, 1334 (11th Cir.
2001)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

the party opposing summary judgment.'"[2] "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'"[3] Upon due consideration of the relevant law, pleadings and respective submissions of the parites, the Court is of the opinion that defendants' motions for summary judgment as to plaintiff's claims are due to be granted.

Jones alleges that defendants unlawfully included charges in the "amount financed" for Guaranteed Asset Protection ("GAP") insurance premiums written in connection with a consumer credit transaction in violation of the Truth in Lending Act ("TILA" or the "Act"), 15 U.S.C. § 1601 *et seq.* and the Act's implementing regulation, Federal Reserve Regulation Z, 12 C.F.R. § 226. GAP insurance is a form of coverage offered to consumers that covers the shortfall between the applicable insurance coverage and any amount still owed in the event a vehicle is determined to be a total loss as a result of theft or damage.[4] Jones argues that the GAP premium was a finance charge that should have been disclosed as such rather than as part of the amount financed. Jones demands judgment against Bill Smith and GMAC for statutory damages pursuant to 15 U.S.C. § 1640 of twice the actual finance charge and for compensatory damages of $330.00, plus interest at the contract rate, and costs and attorneys fees.

Bill Smith seeks summary judgment and asserts that it complied with the requirements of the TILA and Regulation Z when disclosing the GAP insurance premiums. Prior to signing the

---

[2]     *Gray v. Manklow (In re Optical Technologies, Inc.)*, 246 F.3d 1332, 1334 (11th Cir. 2001)(quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted)).

[3]     *Gray v. Manklow (In re Optical Technologies, Inc.)*, 246 F.3d 1332, 1334 (11th Cir. 2001)(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

[4]     *Bragg v. Bill Heard Chevrolet, Inc.* 374 F.3d 1060 n.2 (11th Cir. 2004).

2

RISC, Jones and Bill Smith signed a document entitled "StoneBridge Casualty Insurance Company GAP Asset Protection Schedule" that contained certain GAP disclosures. Bill Smith argues that the GAP Asset Protection Schedule meets all the disclosure requirements necessary to exclude the cost of GAP insurance from the finance charge. GMAC argues that Jones' complaint is barred by the doctrine of res judicata; that GMAC is an assignee of the contract; that as an assignee GMAC has limited liability; and that the GAP disclosures were proper. The Court finds that there are no genuine issues of material fact for trial and that the defendants are entitled to summary judgment as a matter of law.

### FINDINGS OF FACT

1. On June 6, 2006, Jones purchased a 2006 GMC 1500 from Bill Smith and Bill Smith financed the purchase of same. The parties executed a document entitled "Retail Instalment Sale Contract GMAC Flexible Finance Plan" ("RISC") which Bill Smith subsequently assigned to GMAC. The RISC included a charge for GAP insurance in the amount of $330.00. The RISC disclosed the premium amount and included same in the "amount financed," but the RISC did not include the price of the premium in the "finance charges" assessed for the vehicle.

2. The RISC disclosed the insurance premium in two sections. Under the heading entitled "Itemization of Amount Financed" at line 4B, the RISC disclosed the premium amount of $330.00 as "[o]ther insurance paid to the insurance company." Then in the section entitled "Insurance," the contract contains the following language:

> **Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You may provide the required insurance through an existing policy. You may also buy it through someone independent of us. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.
>
> If any insurance is checked below, policies or certificates from the named insurance companies will describe the items and conditions.

3

**Check the insurance you want and sign below:**

**Optional Credit Insurance.**

☐ Credit /Life:    ☐ Buyer       ☐ Co-Buyer        ☐ Both
☐ Credit Disability (Buyer Only)
Premium:
        Credit Life $ _____ N/A _____
        Credit Disability $ _____ N/A _____

(Insurance Company)

(Home Office Address)

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance pays only the amount you would owe if you paid all your payments on time. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

**Other Insurance.**

☐ XX   GAP                              72
                   Type of Insurance          Term

Premium $ _____ 330.00 _____

        SCI
(Insurance Company)

      COLUMBUS OH
(Home Office Address)

I want the insurance checked above.

X   *Travis Jones*                  06/06/2006
Buyer Signature                        Date

X
Co-Buyer Signature                    Date

**ANY INSURANCE REFERRED TO IN THIS CONTRACT DOES NOT INCLUDE COVERAGE FOR PERSONAL LIABILITY AND PROPERTY DAMAGE CAUSED TO OTHERS.**

    3.  Jones signed the RISC requesting GAP insurance below the sentence "I want the insurance checked above."

4

4. Sometime after the parties executed the RISC, Bill Smith assigned its interest in same to GMAC.

5. According to the supplemental affidavit of Ben Armstrong, finance manager for Bill Smith, Jones signed the Gap Asset Protection Schedule indicating that he wished to purchase GAP insurance before signing the RISC. The schedule contains the following disclosures:

**APPLICATION FOR INSURANCE**

I (Buyer) understand that the purchase of GAP Asset Protection is not required nor is it a condition of the extension of credit. I understand that GAP Asset Protection will not be provided unless I (Buyer) sign below and agree to pay the GAP Asset Protection cost set by the Dealer/Lender/Lessor as identified above.

I (Buyer) understand that if I desire GAP Asset Protection, I do not have to obtain such coverage from the Dealer/Lender/Lessor. I may obtain such coverage from anyone I choose that is acceptable to the Dealer/Lender/Lessor.

I (Buyer), whose signature appears below, acknowledge that the information contained above is, to the best of my knowledge and belief, true.

6. The Gap Asset Protection Schedule is printed on a form prepared by Stonebridge Casualty Insurance Company, but Bill Smith provided the document to the debtor and only the debtor and a representative of Bill Smith signed the document. The document is dated June 6, 2006 and was signed when the other documents were signed. Immediately above the GAP disclosures, the document lists $330.00 as the "Gap Asset Protection Cost." The form contains additional information regarding the debtor's thirty day right to examine the insurance certificate and an arbitration clause. This additional information appears below the TILA disclosures and is in a slightly bolder type than the GAP disclosure information. The terms concerning the arbitration information and certain terms concerning the property insurance are capitalized and in bold. However, the heading **"APPLICATION FOR INSURANCE"** is also capitalized and in bold print.

7. On September 28, 2006, Jones filed the above styled petition for relief under Chapter 13. On October 12, 2006, GMAC filed a proof of claim in the amount of $18,691.91. The debtor's plan

Case 06-80150-JAC    Doc 69    Filed 06/13/07    Entered 06/13/07 11:49:00    Desc Main
Document      Page 5 of 26

provided for the payment of GMAC's claim in full with 9% interest through disbursements made by the trustee.

8.  On November 6, 2006, Jones filed this action under the TILA.

9.  On November 17, 2006, Jones filed an amendment to schedules to disclose the lawsuit and an amended Chapter 13 plan.  Jones filed amended Schedules B and C adding the lawsuit and an amended Chapter 13 plan providing that any non-exempt lawsuit proceeds would be paid to the Chapter 13 trustee for distribution.  The amended plan provided for payment of GMAC's secured claim in full with proposed fixed monthly payments of $424.16 with 9% interest.

10.  On December 7, 2006, the Court confirmed the debtor's Chapter 13 plan.  The confirmation order provides that GMAC's claim shall be paid in monthly installments of $493.00 for 44 months or until said claim is paid in full.  The confirmation order does not provide for the lawsuit.

### *TILA REQUIREMENTS*

The stated purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and to avoid the uniformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."[5]   To implement the statutes declared purpose of promoting informed use of credit, the Act "requires creditors to provide consumers with 'clear and accurate

---

[5]      15 U.S.C. § 1601(a); See also *Parker v. Potter,* 2007 WL 465560 *2 (11th Cir. 2007)(*quoting Beach v. Ocwen Fed. Bank,* 523 U.S. 410, 412 118 S.Ct. 1408, 1410-11 (1998)).

6

disclosures of terms dealing with things like finance charges, annual percentage rates of interest and the borrower's rights.'"[6]

When a creditor sells credit insurance products to a consumer in connection with a credit transaction, the Act "requires the creditor to make certain disclosures to buyers before they become obligated on a RISC in which the creditor has excluded the charge for such insurance from the finance charge and included it in the amount financed."[7]  Regulation Z, which was issued by the Federal Reserve Board in support of the TILA, sets forth the specific content and timing of the required disclosures.[8]  In this case, Jones asserts that the defendants failed to make the required disclosures as a precondition to excluding the GAP charges from the finance charge.

The term "finance charge" is defined by the TILA as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."[9]  Regulation Z, § 226.4(b)(10) specifically provides that the term finance charge includes "[c]harges or premiums paid for debt cancellation coverage written in connection with a credit transaction, whether or not the debt cancellation coverage is insurance under applicable law."

To exclude certain insurance premiums and debt cancellation fees from the finance charge, Regulation Z requires creditors to provide the disclosures required under 12 C.F.R. § 226.4(d).[10]

---

[6]      *Parker v. Potter*, 2007 WL 465560 *2 (11th Cir. 2007)(*quoting Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 118 S.Ct. 1408, 1410 (1998)).

[7]      *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir. 2004).

[8]      *Id.*

[9]      15 U.S.C. § 1605(a).

[10]      12 C.F.R. § 226.18(n).

7

Section 226.4(d)(3)(i)(A-C) provides that the finance charge must include any charges or premiums paid for debt cancellation coverage, unless the following conditions are satisfied:

(A) The debt cancellation agreement or coverage is not required by the creditor, and this fact is disclosed in writing;

(B) The fee or premium for the initial term of coverage is disclosed.  If the term of coverage is less than the term of the credit transaction, the term of coverage also shall be disclosed.  The fee or premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving a debt cancellation agreement that limits the total amount of indebtedness subject to coverage;

(C) The consumer signs or initials an affirmative written request for coverage after receiving the disclosures specified in this paragraph.  Any consumer in the transaction may sign or initial the request.[11]

Regulation Z mandates that these disclosure be made "clearly and conspicuously in writing."[12]  The sufficiency of the disclosures must be examined from the "standpoint of an ordinary

---

[11]    The Court notes that both Jones and GMAC inaccurately cite 12 C.F.R. § 226.4(d)(1)(i-iii) as the subsection that allows the exclusion of GAP insurance premiums from the finance charge.  Section 226.4(d)(1) applies to premiums for "credit life, accident, health or loss-of-income insurance" and provides that such premiums may be excluded from the finance charge if the conditions in subsections 226.4(d)(1)(i-iii) are satisfied.  Defendant Bill Smith in its motion for summary judgment accurately cites subsection 226.4(d)(3)(i) as the provision that provides that fees for debt cancellation coverage such as GAP insurance may be excluded from the finance charge if the conditions set forth above are satisfied.  Section 226.4(d)(3)(ii) provides that subsection 226.4(d)(3)(i) "applies to fees paid for debt cancellation coverage that provides for cancellation of all or part of the debtor's liability for amounts exceeding the value of the collateral securing the obligation, or in the event of the loss of life, health, or income or in case of accident."  GAP insurance is a form of debt cancellation coverage. *See Rodriguez v. Lynch Ford*, 2004 WL 2958772 *9 (N.D. Ill. 2004).  For cases applying the disclosures required by 12 C.F.R. § 226.4(d)(3) to GAP insurance premiums see *Matthews v. Johnson*, 2007 WL 1589553 *2 (Bankr. M.D. Ala. 2007); *Gibson v. LTD, Inc.*, 434 F.3d 275 (4th Cir. 2006); *Vallies v. Sky Bank*, 432 F.3d 493 (3rd Cir. 2006); *Rivera v. Grossinger Autoplex, Inc.*, 274 F.3d 1118 (7th Cir. 2001); and *Rodriguez v. Lynch Ford, Inc.*, 2004 WL 2958772 (N.D. Ill. 2004).

[12]    12 C.F.R. § 226.17(a)(1).

8

consumer, not the perspective of a Federal Reserve Board member, federal judge or English professor."[13]

The Court finds that the defendants have proven each of these requirements:

**A. Voluntariness:** Under 12 C.F.R. § 226.4(d)(3)(i)(A), the defendants have demonstrated that GAP coverage was not a condition of extending credit and that fact was disclosed to Jones in writing. While the Court does not find that the RISC clearly and conspicuously made this disclosure, the Court finds that disclosures included in the GAP Asset Protection Schedule provided clear and conspicuous notice that GAP insurance was voluntary, not required to obtain credit, and, if desired, could be obtained elsewhere.

GMAC directs the Court first to the language contained in the RISC which reads in part that the buyer is "not required to buy any other insurance to obtain credit. Your decision to buy or not to buy other insurance will not be a factor in the credit approval process." Below this clause, the RISC contains the heading "Optional Credit Insurance" with boxes to be checked if the debtor wishes to purchase credit life or credit disability insurance. Below the boxes, the RISC contains another paragraph explaining that "[c]redit life insurance and credit disability insurance are not required to obtain credit." Following this paragraph, the RISC contains the heading "Other Insurance" followed by a box and line on which Bill Smith typed the word GAP. Jones argues that the RISC is not clear that GAP insurance is not required because the disclosures contained on the RISC are reasonably capable of different interpretations. Although the language to which GMAC directs the Court indicates that a buyer is "not required to buy any other insurance to obtain credit," the Court agrees with Jones and finds that an ordinary consumer could view this disclosure as

---

[13]     *Lifanda v. Elmhurst Dodge, Inc.,* 237 F.3d 803, 806 (7th Cir. 2001).

Case 06-80150-JAC    Doc 69    Filed 06/13/07    Entered 06/13/07 11:49:00    Desc Main
Document      Page 9 of 26

pertaining only to the "Optional Credit Insurance" products listed immediately below the disclosure. The Court cannot conclude as a matter of law that the statement provides clear and conspicuous notice that GAP insurance, which was listed separately under "Other Insurance," was not required to obtain credit.

The Court finds, however, that the GAP Asset Protection Schedule which the debtor and a representative of Bill Smith signed clearly discloses in writing that coverage is not required by the creditor. The schedule plainly states:

### APPLICATION FOR INSURANCE

I (Buyer) understand that the purchase of GAP Asset Protection is not required nor it is a condition of the extension of credit. I understand that GAP Asset Protection will not be provided unless I (Buyer) sign below and agree to pay the GAP Asset Protection cost set by the Dealer/Lender/Lessor as identified above.

I (Buyer) understand that if I desire GAP Asset Protection, I do not have to obtain such coverage from the Dealer/Lender/Lessor. I may obtain such coverage from anyone I choose that is acceptable to the Dealer/Lender/Lessor.

I (Buyer), whose signature appears below, acknowledge that the information contained above is, to the best of my knowledge and belief, true.

From the standpoint of an ordinary consumer, the Court finds that the terms of the GAP Asset Protection Schedule clearly provide that GAP coverage is voluntary and not required to obtain credit. The first paragraph provides that the buyer understands that GAP coverage is not required, nor is it a condition of the extension of credit. The second paragraph further provides that the buyer understands that the buyer does not have to obtain the coverage from the creditor and may obtain such coverage, if desired, from anyone that is acceptable to the creditor. The Court finds that the plain language of the GAP Asset Protection Schedules clearly discloses that GAP coverage is not required by the creditor to obtain credit.

10

The next question that the Court must determine is whether these disclosures were also conspicuous as required by § 226.17(a)(1). Like clarity, conspicuousness is a question of law that is governed by an objective, reasonable person standard.[14] In *Rivera v. Grossinger Autoplex, Inc.*, 274 F.3d 1118 (7th Cir. 2001), the Seventh Circuit found that an addendum to a financing agreement providing for GAP coverage was clear and conspicuous where the addendum labeled its provisions and capitalized certain terms to draw the reader's attention to material portions of the agreement. In this case, Bill Smith did not capitalize or highlight the required disclosures. While the disclosures in the GAP Asset Protection Schedule do appear to be in a slightly smaller and lighter font than the language that immediately follows the disclosures, the Court finds that the ordinary consumer could and would have easily read the disclosures and understood that coverage was voluntary and not required to obtain credit. Although other terms following the GAP disclosures appear in a slightly larger font, the font used for the disclosures and the placement of same is nevertheless conspicuous. The font used is not so small as to be difficult to read and the placement of the disclosures immediately following the heading "**APPLICATION FOR INSURANCE,**" which is capitalized and in bold, draws the reader's eye to same. Accordingly, the Court finds that the defendants have satisfied the first element that the debt cancellation coverage was not required by the creditor, and this fact was clearly and conspicuously disclosed in writing.

**B. Term of insurance:** Next, Regulation Z § 226.4(d)(3)(i)(B) requires the fee or premium for the initial term of coverage be disclosed. As required by § 226.4(d)(3)(i)(B), the GAP Asset Protection Schedule lists the costs of the GAP coverage as $330.00. The cost of the insurance is clearly and conspicuously listed immediately above the section titled "Application for Insurance."

---

[14]     *Rivera v. Grossinger Autoplex, Inc.*, 274 F.3d 1118, 1122 (7th Cir. 2001).

11

The cost of the insurance is also clearly and conspicuously listed twice on the RISC.

Subsection 226.4(d)(3)(i)(B) further provides that the terms of coverage shall be disclosed if the term of coverage is less than the term of the credit transaction. Here the term of the GAP protection coverage is the same as the credit transaction term, 72 months, so the term of coverage was not required to be disclosed, however, the GAP Asset Protection Schedule includes the "certificate period" beginning and ending dates and the RISC discloses the 72 month term.

**C. Written request signed after receiving disclosures:** Under § 226.4(d)(3)(i)(C), the consumer must sign or initial an affirmative request for coverage after receiving the required disclosures. The debtor signed both the RISC and GAP Asset Protection Schedule indicating that he wished to purchase GAP insurance. The GAP Asset Protection Schedules contains the following statement: "By signing below, I/We acknowledge receipt of the copies of the following documents: Application, Certificate of Insurance, Privacy Notice, Disclosure Statement, Arbitration Clause Endorsement and the separately signed Acknowledgment of Arbitration Agreement." The debtor's signature appears immediately below this statement and is dated June 6, 2006.

Regulation Z provides that the creditor shall make the required disclosures "before consummation of the transaction.[15] Consummation is defined as the "time that a consumer becomes contractually obligated on a credit transaction."[16] The supplemental affidavit of Ben Armstrong, finance manager for Bill Smith, reveals that Jones signed the Gap Asset Protection Schedule indicating that he wished to purchase GAP insurance before signing the RISC at which point the debtor became contractually obligated on the credit transaction. Accordingly, the Court is satisfied

---

[15]     12 C.F.R. § 226.17(b).

[16]     12 C.F.R. § 226.2(a)(13).

12

that Jones signed the GAP Asset Protection Schedule prior to signing the RISC and finds that defendants have satisfied the third and final requirement under § 226.4(d)(3)(i)(C) that the "consumer signs or initials an affirmative written request for coverage after receiving the disclosures specified in this paragraph."

## PLAINTIFF'S ARGUMENTS

Plaintiff contends that the disclosures defendants' rely upon do not objectively comply with the TILA requirements as they are (1) not clear and conspicuous; and /or (2) not grouped together with other credit insurance disclosures; and /or (3) not provided by a creditor to the transaction.

**(1) Clear and Conspicuous:** Jones contends that the GAP insurance disclosures on the GAP Asset Protection Schedule are not "conspicuous" as the reader's eye is drawn, not to any information that this insurance is not required, but to more conspicuous terms concerning required property insurance and arbitration, which are not only bolded but also in capital letters. Jones argues that the capitalized information overshadows any TILA-specific information. GMAC responds that while 12 C.F.R. 226.17(a) requires that the finance charge and the annual percentage rate "be more conspicuous that any other disclosure . . .," there is no requirement under Regulation Z that the GAP disclosures be the *most* or even *more* conspicuous than other provisions on the document. Several of the cases upon which Jones relies, including *Lifanda v. Elmherst Dodge, Inc.* 237 F.3d 803, 808 (7th Cir. 2001), are distinguishable.[17] In *Lifanda,* the court found that the GAP disclosures were not

---

[17]        *See Smith v. Chapman*, 614 F.2d 968 (5th Cir. 1980)(finding Texas Consumer Credit Code was violated where insurance disclosure was on back of the document and in same type as all other disclosures). Here the disclosures were on the front of the GAP asset schedule and were listed immediately below the title **"APPLICATION FOR INSURANCE"** which draws the reader's eye to same. *See also Cole v. U.S. Capital, Inc.,* 389 F.3d 719 (7th Cir. 2004) (finding disclosure of consumer's rights under the FCRA, was not clear and conspicuous where disclosure was made in paragraph at very bottom of offer, printed in font size that was no larger than six-point, and that was not set off from remainder of offer in any way, except by being so unusually small that it almost could not be read with the naked eye). Here the disclosure is in the

13

conspicuous because the disclosures were "set forth in the smallest type on the form, which is so minuscule as to be barely legible." The court explained that if the term "conspicuous" was to "retain any meaning at all, it cannot be met as a matter of law by type disproportionately small to that in the rest of the document, and which is itself barely legible."[18] Here, the TILA disclosures are in a font that is slightly smaller that other disclosures in the document and same are not capitalized like other terms in the document, yet the Court finds that the terms remain conspicuous. The type set for the disclosures are not disproportionately smaller than the type in the rest of the document and the disclosures are clearly legible. The disclosures are located in the middle of the page immediately below the title "**APPLICATION FOR INSURANCE**" which draws the reader's eye to same.

    **(2) Grouped Together with other Credit Insurance Disclosures:** Plaintiff refers the Court to Regulation Z 12 C.F.R. § 226.17 which governs the form of TILA disclosures and requires the following:

    (a) Form of disclosures.

> (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related [FN37] to the disclosures required under § 226.18. [FN38] The itemization of the amount financed under § 226.18(c)(1) must be separate from the other disclosures under that section.

---

middle of the page, same is printed in a font that is easily read, and is set off from the remainder of the disclosures by being placed immediately under the title "**APPLICATION FOR INSURANCE.**"

    [18]    *Lifanda v. Elmherst Dodge, Inc.* 237 F.3d 803, 808 (7th Cir. 2001).

Jones argues that defendants' disclosures were not grouped together with other disclosures and were spread over at least one other document in violation of 12 C.F.R. § 226.17(a)(1). Footnote 38 to § 226.17(a) explains, however, that certain "disclosures may be made together with or separately from other required disclosures" including the insurance and debt cancellation disclosures required by § 226.18(n). The Rules of Construction for Regulation Z, 12 C.F.R. § 226.2(b)(4), provide that "[f]ootnotes have the same legal effect as the text of the regulation." Accordingly, the fact that the required disclosures were made on the GAP Asset Protection Schedule rather than the RISC does not violate the TILA requirements.

Other courts have approved the use of GAP disclosures contained in addendums or separate documents such as that presently before the Court. In *Matthews v. Johnson (In re Matthews)*, 2007 WL 1589553 (Bankr. M.D. Ala. 2007), Judge Williams determined that GAP disclosures provided in a form entitled "Certificate of Insurance Guaranteed Automobile Protection" were sufficient to permit the exclusion of the GAP premium from the finance charge under the TILA. The signed disclosure clearly advised the debtor in writing that coverage was not required and of the premium costs. In *Williams v. Lynch Ford*, 2004 WL 2997508 (N.D. Ill. 2004), the plaintiff signed both a retail installment contract and a separate document entitled Guaranteed Auto Protection Agreement. The agreement included language similar to that before the Court, "Borrower/lessee further understands that this Addendum is not required in order to obtain financing or to purchase the vehicle. You acknowledge that your participation in this GAP Program is voluntary and not a condition of the installment sale contract/loan/lease." The district court concluded that this language contained in the separate GAP addendum satisfied the TILA requirements. The RIC disclosed the enrollment fee and the GAP addendum specified in writing that coverage was not required. In

15

*Rivera v. Grossinger Autoplex, Inc.,* 274 F.3d 118 (7th Cir. 2001), the Seventh Circuit upheld the validity of the terms of an addendum to an automobile financing agreement for disclosing that GAP coverage was voluntary and not required to obtain coverage.

**(3) Not provided by a Creditor:** Jones contends that defendants did not satisfy the requirement in Regulation Z 12 C.F.R. § 226.17(a)(1) that the required disclosures be provided by a creditor because the GAP Asset Protection Schedule upon which defendants rely were provided on a form prepared by Stonebridge Casualty, the insurance company providing Jones with GAP insurance. Jones cites the case of *Vallies v. Sky Bank*, 432 F.3d 493 (3rd Cir. 2005) in support of his argument that defendants did not make the required disclosures.

In *Vallies*, the plaintiff obtained a loan from a bank to purchase a truck from a Ford dealer. As part of the loan, the bank financed a $395 charge for GAP insurance, however, the bank did not include this amount in its calculation of the total finance charge. On the same day, the plaintiff singed a form entitled "GAP Waiver Agreement" that contained the correct cost of the GAP insurance and the TILA disclosures required to exclude the GAP premium from the finance charge. The waiver was signed only by the plaintiff and the car dealer, but not by the bank. Subsequently, the plaintiff sued the bank alleging that the bank failed to provide the disclosures required by the TILA. The district court found that the car dealer's disclosure of the premium in the GAP waiver form satisfied the TILA requirements. The Third Circuit reversed finding the creditor, Sky Bank, and only the creditor, could provide the required disclosures. The court viewed Sky Bank and not the dealer as the creditor obligated to make these disclosures. Because the car dealer had provided some of the required disclosures in the case, the court held that the bank violated the TILA. The court wrote:

16

> This separate GAP Waiver form was not incorporated into Sky Bank's loan and Sky Bank was not a party to the GAP Waiver agreement. Morever, nothing contained in the agreement would suggest to Vallies that Fitts [the car dealer] was acting on the bank's behalf in entering it. Instead, the agreement was signed only by Vallies and Fitts.[19]

The court explained that TILA places a clear and affirmative duty on the creditor to "disclose any and all required information pertaining to GAP coverage and that where the creditor fails to disclose this information, it has violated TILA regardless of the ultimate receipt of information."[20]

Jones reliance upon *Vallies* is misplaced. To determine whether the disclosures were provided by a creditor, the Court must first turn to the TILA to determine how the term "creditor" is defined for purposes of the TILA. The Act defines the term creditor as follows:

> The term "creditor" refers only to a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness. . . .[21]

The parallel provision found in Regulation Z at 12 C.F.R. 226.2(17) defines the term creditor as:

> A person (A) who regularly extends consumer credit [FN3] that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

For a person to qualify as a creditor under the TILA, the person must satisfy both prongs of § 1602(f) and Regulation Z.[22] The person must (1) regularly extend credit; and (2) must be the

---

[19]   *Vallies v. Sky Bank*, 432 F.3d 493, 494 (3rd Cir. 2005).

[20]   *Vallies v. Sky Bank*, 432 F.3d 493, 496 (3rd Cir. 2005).

[21]   15 U.S.C. § 1602(f).

[22]   *Parker v. Potter*, 2007 WL 465560 *3 (11th Cir. 2007).

17

person to whom the debt is owed on the face of the loan.[23]  Here, Bill Smith is an automobile dealer engaged in the regular business of selling automobiles to consumers on a credit sales basis.  Bill Smith is the person to whom the debt arising from the consumer credit transaction was initially payable on the face of the RISC.

The Act also requires the creditor in "each consumer credit transaction other than under an open end credit plan" to disclose "the identity of the creditor required to make disclosure."[24]  The RISC identifies Bill Smith as the creditor in this transaction:

> You, the Buyer (and Co-Buyer, if any) may buy the vehicle described below for cash or on credit.  By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay us, the Creditor, the Amount Financed and Finance Charge according to the payment schedule shown below.  We will figure the Finance Charge on a daily basis.

Bill Smith is identified as the creditor on the signature line of the RISC.  Accordingly, the Court finds that Bill Smith is the creditor as that term is defined by the TILA and Regulation Z.

Having found that Bill Smith is the creditor as that term is defined by the TILA and Regulation Z, the Court next finds that  Bill Smith is the only party that made the TILA disclosures as required by Regulation Z § 226.17(a).  Jones obtained his loan from Bill Smith and Bill Smith acting as dealer and creditor provided Jones with both the RISC and the GAP Asset Protection Schedule.  Jones and a representative of Bill Smith signed both of these documents.   The required disclosures were not made by a third-party, Stonebridge Casualty.  Stonebridge Casualty simply provided the document to Bill Smith just as GMAC provided Bill Smith with the RISC.  Neither Stonebridge nor GMAC signed either of the documents.  Jones obtained his loan from Bill Smith

---

[23]     *Parker v. Potter*, 2007 WL 465560 *3 (11th Cir. 2007).

[24]     15 U.S.C. § 1638(a)(1).

to purchase the truck from Bill Smith.  Bill Smith provided Jones first with the GAP Asset Protection Schedule, and then the RISC.  Unlike the facts involved in *Vallies,* all disclosures came from a single creditor, Bill Smith, regardless of the heading printed on each form used by the creditor.[25]

*Vallies* is further distinguishable from the case at bar because unlike *Vallies* in which the GAP agreement was not incorporated into the creditor's loan agreement, in this case the terms of the GAP agreement were incorporated into the RISC.  The RISC clearly itemized the GAP premium as part of the amount financed.[26]  Accordingly, the Court rejects Jones' argument that the required disclosures were not provided by a creditor.

## ASSIGNEE LIABILITY

The Court having found that the creditor Bill Smith satisfied the TILA disclosure requirements, needs not address GMAC's liability as an assignee of the loan.  The Court finds in the alternative, however, on behalf of GMAC, that GMAC's liability is limited as an assignee under the TILA.   GMAC directs the Court to the Official Commentary to Regulation Z as support for its argument that GMAC is an assignee in the transaction involved here.  The Official Commentary

---

[25]   *Matthews v. Johnson (In re Matthews)*, 2007 WL 1589553 (Bankr. M.D. Ala. 2007)(distinguishing *Vallies* on the ground that unlike Sky Bank in *Vallies* the financing creditor in *Matthews* was a party to the GAP agreement and the terms of the GAP agreement were incorporated into the loan agreement).

[26]   *Matthews v. Johnson (In re Matthews)*, 2007 WL 1589553 (Bankr. M.D. Ala. 2007)(distinguishing *Vallies* on the ground that the terms of the GAP agreement in *Matthews* were incorporated into the loan agreement whereas the terms of the GAP agreement were not  incorporated into the *Vallies'* loan document).

19

takes a strict position on the initially payable rule explaining the distinction between creditors and assignees as follows:

> 2. Assignees. If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person. For example:
>
> An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for immediate assignment of the obligation to the bank. The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction. 12 C.F.R. pt 226. supp. I, subpt. A. cmt. 2(a)(17)(i)(2).

The Supreme Court has stated that deference to official administrative agency commentary is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z, and, unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive.[27] Other courts have cited this commentary for purposes of distinguishing between creditors and assignees under the TILA in situations similar to that before the Court.[28]

In this case, the RISC clearly identified Bill Smith as the creditor and provided further for the assignment of the contract to GMAC. The RISC provides that the seller "may assign this contract and retain its right to receive a part of the finance charge." The RISC further provides that "[i]f we assign this contract to General Motors Acceptance Corporation (GMAC), the GMAC Dispute Resolution Agreement you sign with this contract will apply to claims related to this

---

[27] *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565 (1980).

[28] *See Madel v. GMAC*, 2004 WL 4055247 (Bankr. E.D. Wis. 2004); *Riviere v. Banner Chevrolet, Inc.,* 184 F.3d 457, 462 (5th Cir. 1999)(finding district court erred in rejecting the FRB staff commentary).

20

contract." Pursuant to the clear terms of the contract and under the Official FBR staff interpretation regarding the distinction between "creditors" and "assignees," the Court finds that Bill Smith is the creditor in this transaction to whom this obligation was initially payable and GMAC is clearly defined as an assignee in the transaction.

The Eleventh Circuit has recently explained that the TILA "does not impose a duty upon assignees to determine whether appropriate disclosures were made, other than those apparent on the face of the document."[29] The Act addresses the liability of assignees and provides that:

> Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter or proceeding under section 1607 of this title which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter.[30]

Under § 1641(a), for an assignee of a loan to be held liable for disclosure violations, the alleged violation must be discernable solely from an examination of the face of the disclosure statement.[31] Where the fact of a TILA violation depends on extrinsic knowledge, for instance charges made but not shown on the disclosure statement, the assignee will not be liable under the TILA.

In *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703 (1998), the Eleventh Circuit held that GMAC, as an assignee, was not liable for misrepresentations that required the court to resort to evidence or documents extraneous to the disclosure statement. The court explained that to require

---

[29]     *Parker v. Potter*, 2007 WL 465560 *3 (11th Cir. 2007).

[30]     15 U.S.C. § 1641(a).

[31]     *Alexiou v. Brad Benson Mitsubishi*, 127 F.Supp.2d 557 (D.N.J. 2000).

Case 06-80150-JAC    Doc 69    Filed 06/13/07    Entered 06/13/07 11:49:00    Desc Main
Document      Page 21 of 26

otherwise would "impose a duty of inquiry on financial institutions that serve as assignees. Yet this is the very kind of duty that the statute precludes, by limiting the required inquiry to defects that can be ascertained from the face of the documents themselves."[32] Because the Act is designed to protect consumers, the TILA requires assignees "to be sure that there are no TILA violations on the face of the document. To be sure, assignees are not liable to the same extent as creditors, however, only clear violations, those 'on the face' of the disclosure statements, will create liability in the assignee.[33]

The Court finds under the circumstances of this case GMAC is clearly an assignee as that term regularly defined under TILA and Regulation Z and that GMAC's liability is limited to that of an assignee.

### RES JUDICATA

GMAC argues this case should be dismissed because the complaint is barred by the equitable doctrine of res judicata and cites the recent decision of *Graves v. First Educators Credit Union*, 2007 WL 824059 (Bankr. N.D. Ala. 2007) in support of its motion for summary judgment. In *Graves*, the bankruptcy court held that debtors' TILA complaint was barred by the doctrine of res judicata due to confirmation of their Chapter 13 plan which called for the full payment of the creditor's secured claim.

All four of the following elements must be present in order to establish that a case is barred under the doctrine of res judicata:

> First, the prior judgment must be valid in that it was rendered by a court of competent jurisdiction and in accordance with the requirements of due process. Second the judgment must be final and on the merits. Third, there must be identity

---

[32]     *Ellis v. General Motors Acceptan*ce *Corp.*, 160 F.3d 703, 709 (11th Cir. 1998).

[33]     *Myers v. CitiCorp Mortgage, Inc.*, 878 F.Supp. 1553, 1558 (M.D. Ala. 1995).

of both parties or their privies. Fourth, the later proceeding must involve the same cause of action as involved in the earlier proceeding.[34]

GMAC contends and the Court finds that each of these four elements are satisfied in this case by the order confirming the debtor's plan. With respect to the first element, as explained by the Eleventh Circuit in *Eastman Kodak Co. v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.)*, 456 F.3d 1277, 1285 (11th Cir. 2006), there is no real question when dealing with confirmation orders that a bankruptcy court is a court of competent jurisdiction. A review of the docket, further reveals that the confirmation order in this case was rendered in accordance with the requirements of due process. GMAC filed a proof of claim in the case and received sufficient notice of the contents of the debtor's plan and the confirmation hearing prior to confirmation. The Eleventh Circuit has further explained with respect to the second element, that the "issue has been settled for some time: a bankruptcy court's order confirming a plan of reorganization is given the same effect as any district court's final judgment on the merits."[35] On December 7, 2006, the Court confirmed the debtor's Chapter 13 plan and there was no appeal from that order. Accordingly, the Court finds that the first and second elements are satisfied. As to the third element, the Court further finds that the necessary "identify of the parties" requirement is satisfied as both the debtor and defendant took part in the confirmation process.

Finally, as to the fourth element, the Court finds that the claims made in the debtor's adversary proceeding involve the same cause of action as involved in the order confirming the debtor's plan. With respect to the fourth element the court in *Graves* wrote:

---

[34] *Eastman Kodak Co. v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.)*, 456 F.3d 1277 (11th Cir. 2006).

[35] *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks)*, 898 F.2d 1544, 1550 (11th Cir. 1990).

23

If the Debtors intended to reduce FECU's claim for TILA violations by asserting such violations as a matter of defense by recoupment or set-off, then the Confirmed Plan should not have proposed to pay the full amount of the Loan. The amount of the Loan owing to FECU as a secured creditor was an issue that had to be resolved under Section 1325(a)(5)(B) before the Debtors' were entitled to confirmation of their proposed plan. Similarly, the amount of the Loan owing to FECU is an issue again raised in this adversary proceeding. Unlike the Confirmed Plan, the Debtors' adversary complaint alleges the Loan should be reduced by recoupment or set-off in the amount of actual and statutory damages awarded for violations of TILA.

The court explained that under § 1325(a)(5)(B)(ii) a Chapter 13 plan must pay the full value of any allowed secured claim which must be fixed at confirmation. "Issues associated with the treatment of secured claims under 11 U.S.C. § 1325(a)(5) must be resolved to achieve plan confirmation, and they cannot be revisited post-confirmation by way of subsequent objections to claims or adversary proceedings."[36] Accordingly, the court determined that the debtors' adversary proceeding was barred by res judicata due to confirmation of debtors' Chapter 13 plan which called for the full payment of the creditor's secured claim. Once the court entered the confirmation order, the order bound the parties to its terms pursuant to 11 U.S.C. § 1327 which provides that "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."

The Graves argued that references in their confirmed plan and Schedule B to "potential/possible claims v. listed creditors" provided sufficient notice to preserve their counterclaim post-confirmation. The court rejected this argument and held that the vague blanket reservation of rights against creditors who were not specifically identified was ineffective to prevent

_____

[36] *Graves v. First Educators Credit Union (In re Graves)*, 2007 WL 824059 *8 (Bankr. N.D. Ala. 2007).

24

the application of res judicata. The court concluded that the confirmation order was binding as to all parties as to the extent and amount of the defendant's claim.

In the case before the Court, the debtor, prior to confirmation, filed this action against defendants under the TILA and filed an amendment to schedules to disclose the lawsuit. Jones filed amended Schedules B and C adding the lawsuit and an amended Chapter 13 plan providing that any non-exempt lawsuit proceeds would be paid to the Chapter 13 trustee for distribution. The confirmation order dated December 7, 2006 provides that "GMAC SHALL BE PAID MONTHLY INSTALLMENTS OF $493.00 FOR 44 MONTHS OR UNTIL SAID CLAIM IS PAID IN FULL." Although the debtor's amended plan, dated November 17, 2006, provided a vague reference that "[a]ny non-exempt lawsuit proceeds" would be paid into the Chapter 13 plan to be distributed to the creditors, the confirmation order did not specifically reserve a cause of action against defendants. Instead, the confirmation order provided for the full payment of GMAC's claim. The confirmation order was not appealed. Accordingly, the Court finds that the fourth and final element of res judicata is satisfied.

### *CONCLUSION*

For the reasons expressed herein, the Court concludes that the $330 GAP premium was properly excluded from the "finance charge" disclosed by the creditor, Bill Smith, and it's assignee, GMAC. Alternatively, the Court finds that Jones' adversary proceeding is barred by the doctrine of res judicata due to the confirmation of the debtor's plan which called for the full payment of GMAC's claim. A separate order will be entered granting defendants' motions for summary judgment.

Dated:  June 13, 2007

/s/ Jack Caddell
Jack Caddell
U.S. Bankruptcy Judge

JAC/mhb

xc:      Debtor(s)
        A. Wilson Webb, attorney for plaintiff(s)
        Paul J. Spina, III, attorney for GMAC
        Jeffrey Ingram, attorney for Bill Smith
        trustee

26